# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

INTERNATIONAL COMMERCIAL ARBITRATION COURT

| | |
|---|---|
| **SOLAR ECLIPSE INVESTMENT FUND VII, LLC, SOLAR ECLIPSE INVESTMENT FUND VIII, LLC, SOLAR ECLIPSE INVESTMENT FUND XIV, LLC, SOLAR ECLIPSE INVESTMENT FUND XXVII, LLC, SOLAR ECLIPSE INVESTMENT FUND XXXII, LLC, SOLAR ECLIPSE INVESTMENT FUND XXXV, LLC,** | Case No. 2020-27234-CA-01<br><br>Division: 47<br><br>**COMPLAINT** |
| Plaintiffs. | |
| v. | |
| **T-MOBILE USA, INC., INTERNATIONAL SPEEDWAY CORPORATION, MARSHALL & STEVENS, INC.,** | |
| Defendants. | |

Solar Eclipse Investment Fund VII, LLC ("**DC Solar Fund VII**"), Solar Eclipse Investment Fund VIII, LLC ("**DC Solar Fund VIII**"), Solar Eclipse Investment Fund XIV, LLC ("**DC Solar Fund XIV**"), Solar Eclipse Investment Fund XXVII, LLC ("**DC Solar Fund XXVII**"), Solar Eclipse Investment Fund XXXII, LLC ("**DC Solar Fund XXXII**"), Solar Eclipse Investment Fund XXXV, LLC ("**DC Solar Fund XXXV**") for their complaint against Defendants T-Mobile USA, Inc. ("**T-Mobile**"), International Speedway Corporation ("**ISC**"), and Marshall & Stevens, Inc. ("**M&S**") alleges on information and belief as follows:

### INTRODUCTION

1.       T-Mobile, ISC, and M&S enabled and participated in a $2 billion fraud and substantially and proximately caused harm to Plaintiffs.

2.       T-Mobile and ISC each pretended that they were leasing thousands of mobile solar generators ("**MSGs**") from DC Solar Distribution, Inc. ("**DC Solar Distribution**") under long-term leases and paying DC Solar Distribution hundreds of millions of dollars.

3.       The truth was that each of T-Mobile and ISC entered into sham contracts with DC Solar Distribution that they knew were false—neither T-Mobile or ISC were leasing thousands of MSGs.  The real truth was that T-Mobile and ISC knew that the principals of DC Solar Solutions, Inc. ("**DC Solar Solutions**") and other co-conspirators (the "**Fraudsters**") were using the sham contracts to defraud unsuspecting investors—Plaintiffs.

4.       ISC and T-Mobile each entered into materially identical agreements that contained the same false provision - a guarantee of an income stream via MSG rentals.

5.       ISC hid from Plaintiffs that ISC had a secret, separate agreement with DC Solar Distribution that gave ISC the right to cancel all of its leases.  ISC then directly took the Plaintiffs' money—at least $7.5 million dollars per year—and funneled it through DC Solar Solutions to ISC for "sponsorship payments."  Thus, ISC directly benefitted from the fraud.

6.       ISC knew what it was doing was wrong.  In an email dated December 8, 2016, Kelleher told Alex McGhee of DC Solar: "There is already an element that *feels 'sneaky'* to a few here (addendum to a lease) and I can't afford to add additional question marks to the deal."

7.       Moreover, in ISC internal emails on December 28, 2016, Greg Motto, an executive at ISC, when asked whether there should be a written acknowledgement from the

Funds that they were aware of the ISC Sublease Agreement Addenda, told Kelleher, "Simply put, we need to have it writing, verbal understandings *get us in trouble* down the road." But ISC never got it in writing and concealed the Addenda from the Funds. If Plaintiffs had known of the Addenda, Plaintiffs would not do the deal and ISC would not have received its sponsorship payments.

8.      M&S was also aware of the sham nature of the contracts between ISC and DC Solar Distribution and concealed the true nature of the contracts from Plaintiffs.

9.      M&S worked together with ISC to promote the ISC agreement to third parties as a legitimate long-term lease.

10.     T-Mobile entered into a September 2015 contract with DC Solar Distribution, in which T-Mobile purported to lease at least 1,000 MSGs at more than $1,100 per month for ten years.  However, T-Mobile knew when it signed that it would not honor the contract and lease *any* MSGs on a long-term basis.

11.     Instead, T-Mobile, through its operations manager who had T-Mobile's actual and apparent authority to enter into such agreements and bind T-Mobile, assisted the Fraudsters to use the T-Mobile contract to induce Plaintiffs to invest in MSGs through DC Solar Solutions.

12.     T-Mobile negligently supervised its employees and officers, including its operations manager, and allowed the fraud to occur using T-Mobile's name.  T-Mobile even went on to lease a small number of MSGs on a short-term basis to help fool investors. When the operations manager left T-Mobile and joined the Fraudsters at DC Solar, T-Mobile still allowed its name to be used as part of the fraud.

13.     T-Mobile, ISC and M&S also participated in the fraud by falsely representing that the MSGs were being leased in accordance with the subleases.  The MSGs were *not* being leased in accordance with the subleases.

14.     These fraudulent misrepresentations substantially caused Plaintiffs' losses and enabled a $ 2 billion fraud.

15.     By this action, Plaintiffs seek to hold T-Mobile, ISC and M&S accountable and to recover the losses caused by their conduct.

## PARTIES, NO FEDERAL ONLY STATE JURISDICTION, AND VENUE

16.     "**Funds**" as used in this Complaint shall mean: SOLAR ECLIPSE INVESTMENT FUND VII, LLC; SOLAR ECLIPSE INVESTMENT FUND VIII, LLC; SOLAR ECLIPSE INVESTMENT FUND XIV, LLC; SOLAR ECLIPSE INVESTMENT FUND XXVII, LLC; SOLAR ECLIPSE INVESTMENT FUND XXXII, LLC; SOLAR ECLIPSE INVESTMENT FUND XXXV, LLC.

17.     Defendant T-Mobile USA, Inc. is a Delaware corporation with offices in Florida.

18.     ISC is a citizen of Florida because it is a Florida corporation that maintains its principal place of business in Daytona Beach, Florida.

19.     M&S is a citizen of California whose principal place of business is 800 W. 6th Street, Suite 950, Los Angeles, California 90017 and maintains offices at 201 North Franklin Street, Suite 1990, Tampa, FL 33602.

20.     Jurisdiction is proper in the Circuit Court because Plaintiff seeks damages in excess of $15,000.

21.     Venue is appropriate in the International Commercial Arbitration Court because this litigation is substantially related to Case No. 2020-014247-CA-01 pending before this Court

-4-

and relates to the assets of the Receivership in that action over which this Court has exclusive jurisdiction. Defendants T-Mobile and ISC transact their customary business in Miami-Dade County.

22.     Defendants T-Mobile, ISC and M&S are each subject to personal jurisdiction in Florida pursuant to Florida Statutes §48.193 because each has conducted substantial and not isolated business and activities within Florida, and each has itself or through an agent, including but not limited to its partners, operated, conducted, engaged in or carried on business in this State that gave rise to this cause of action, committed a tortious act in this State, including making false and negligent misrepresentations to the Funds and the manager of the Funds who is a Florida resident, or caused injury to persons or property in Florida resulting from its activities within and outside of this State in connection with services provided in Florida or the solicitation of business in this State.

23.     No complete diversity of citizenship exists among the parties because Plaintiffs and M&S are both citizens of California. No federal claim jurisdiction exists over this Complaint.

24.     Defendants participated in or were negligent in advancing the same fraud, i.e., the false appearance of long-term leases to induce Plaintiffs to invest in MSGs, using the same fraudulent scheme, interacting with the same fraudsters, interacting with the same Funds, causing the same injury, and involving the same witnesses of the fraud.

25.     Defendants are jointly, severally or alternatively liable.

26.     Plaintiffs' right to relief arises out of the same transaction or occurrence, or series of transactions or occurrences, namely the DC Solar Transactions described below.

27.     The same operative facts serve as the basis of claims against all Defendants.

28.     There is here an identical scheme (a $2.5 billion fraud) that injured the identical persons or class of persons (the Funds) using the same instrumentality (DC Solar Solutions and DC Solar Distribution) and technique (pretending that Defendants had signed binding, long-term leases for MSGs that would guarantee an income stream) and resulted in the same harm (reliance by the Funds on the misstatements of Defendants in losing hundreds of millions of dollars) and involving the same Ponzi scheme and the same fraudsters.

29.     There are numerous common factual and legal issues in this matter that could include the comparative fault of other parties and nonparties, the comparative fault of the Funds and investors, the liability of nonparty intentional tortfeasors, intervening tortfeasors' interruption of the causal chain, the extent and amount of the Funds' injuries, mitigation by the Funds, the actual values of the MSGs, the due diligence conducted by the Funds, and statutes of limitation.

30.     Plaintiffs are the sole beneficiaries of their claims, which do not belong to any debtor in bankruptcy.

### FACTUAL ALLEGATIONS
### HISTORY OF DC SOLAR

31.     In or around December 2009, Jeff and Paulette Carpoff began operating DC Solar Solutions and DC Solar Distribution (together "DC Solar").

32.     The business model of DC Solar was supposed to be the purchase, sale and lease back of MSGs, which consist of solar panels that are placed on a wheeled trailer and are capable of producing substantial power.   DC Solar Solutions was supposed to manufacture the MSGs and sell them to investment funds that raised third party investments. DC Solar Distribution was supposed to be the entity that leased the MSGs from the Funds and then, in turn, to third parties,

including negotiating the lease agreements and collecting the lease payments from the third-party lessees.

33.     Defendants knew that DC Solar Solutions was representing to the Funds that there was a substantial market demand for MSGs and that DC Solar Distribution had entered into ten-year lease agreements with third parties for thousands of MSG units.

34.     To purchase the MSGs, Funds deposited approximately 30% of the sale price for each MSG being purchased, or $45,000.00 per MSG, into a bank account created for each Fund. The Funds then remitted the $45,000 per MSG being purchased to DC Solar Solutions and issued a promissory note to DC Solar Solutions for the remaining approximately 70% of the purchase price per MSG. This note from the Funds to DC Solar Solutions supposedly would be paid down through the revenue generated by leases that DC Solar Distribution managed with third parties.

35.     Defendants knew that DC Solar Solutions was representing to the Funds that there was a constant demand for the MSGs such that DC Solar Distribution could lease them out on long-term leases without problems. The existence of lease revenue was critical to the investments for two reasons. First, the lease revenue was used as part of the valuation of the MSGs at $150,000.00 per unit. Second, the lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the purchase price of the MSGs.


## THE FUNDS' PURCHASES OF MSGs

36.     On or around March 28, 2013, Plaintiff DC Solar Fund VII purportedly purchased MSGs that were supposedly worth $34 million from DC Solar Solutions.

37.    On or around June 14, 2014, Plaintiff DC Solar Fund VIII purportedly purchased MSGs that were supposedly worth $34 million from DC Solar Solutions.

38.    On or around March 18, 2015, Plaintiff DC Solar Fund XIV purportedly purchased MSGs that were supposedly worth $34 million from DC Solar Solutions.

39.    On or around December 28, 2016, Plaintiff DC Solar Fund XXVII purportedly purchased MSGs that were supposedly worth $34 million from DC Solar Solutions.

40.    On or around June 30, 2017, Plaintiff DC Solar Fund XXXII purportedly purchased MSGs that were supposedly worth $64.5 million from DC Solar Solutions.

41.    On or around November 29, 2014, Plaintiff DC Solar Fund XXXV purportedly purchased MSGs that were supposedly worth $48.8 million from DC Solar Solutions.

42.    The foregoing transactions are referred to as the "**DC Solar Transactions**."

## DEFENDANTS' PARTICIPATION IN JOINT FRAUDULENT SCHEME

43.    T-Mobile's relationship with the Carpoffs began in May 2012 when T-Mobile was looking to save money with respect to backup generators during power outages. In this effort, Alan Hansen (**"Hansen"**), an executive at T-Mobile whose actions were on behalf of and binding on T-Mobile acted with apparent authority to third parties, including the Funds.

44.    Hansen said that the MSGs fit what T-Mobile needed for backup generators and, at $1,000 per unit per month, would be cheaper than renting a traditional, diesel-powered generator. It was also a green energy source that appealed to T-Mobile.

45.    In September 2015, DC Solar Distribution presented T-Mobile with a lease contract that required T-Mobile to lease 1,000 MSGs from DC Solar Distribution at a rent of $1,100 per month for ten years (the "**T-Mobile Lease**").  The contract required T-Mobile to pay more than $130 million over ten years.

46.     Hansen signed the contract on behalf of T-Mobile on September 11, 2015. Hansen acted on behalf of and his execution of the contract was binding on T-Mobile. Moreover, Hansen acted with apparent authority to third parties, including the Funds.

47.     However, T-Mobile knew that the contract would never be enforced.  Instead, T-Mobile would continue to rent MSGs on an as-needed and temporary basis and only pay for the actual time the MSGs were used by T-Mobile.

48.     T-Mobile knew that the T-Mobile Lease would be provided to Plaintiffs to induce them to invest in MSGs.

49.     Various personnel at T-Mobile knew or should have known the true nature of the relationship between DC Solar Distribution and T-Mobile, including Darcey Rushing-Estes, Director-Engineering, West Division and Joseph Barnhart, Operations Manager.  Yet, T-Mobile failed to disclose to the Funds that T-Mobile did not have a long-term lease with DC Solar Distribution.

50.     Hansen's relationship with DC Solar created a major conflict of interest and affected the objectivity of Hansen.  Hansen's actions are imputed to T-Mobile and Hansen's acts are T-Mobile's acts.  Moreover, Hansen's relationship with DC Solar was a red flag that T-Mobile's own Code of Conduct warned of and demonstrated to T-Mobile the very problems that existed. Specifically, T-Mobile's own Code of Conduct recognized that fraudulent collusion between employees and supplier like DC Solar was a foreseeable consequence to T-Mobile: "Avoid relationships with any T-Mobile employee that affect or might appear to affect the objectivity of the employee's judgment or that creates or appears to create a conflict of interest for that employee."  Despite being on notice under its own regulations, T-Mobile did nothing to stop the fraud that T-Mobile was participating in through at least Hansen or even investigate.

51.     When Hansen left T-Mobile for T-Mobile's supplier DC Solar, T-Mobile still did nothing to stop the fraud that continued to occur, even though T-Mobile was on notice of a problem and had a duty to investigate. Had T-Mobile properly supervised its own employee, followed its own Code of Conduct, or even done a basic investigation into Hansen's relationship with DC Solar, it would have discovered the fraudulent T-Mobile Lease and prevented the fraud.

52.     T-Mobile knew that DC Solar Solutions was using the reputation and name of T-Mobile to induce investors to invest in MSGs through DC Solar Solutions.

53.     T-Mobile also knew that DC Solar Solutions intended to use the T-Mobile Lease as part of its pitch to lure investors into investing in MSGs as part of a tax credit program.

54.     As T-Mobile knew and intended, the T-Mobile Lease was provided to the Funds to induce them to invest in DC Solar Solutions transactions and to purchase MSGs.

55.     T-Mobile made representations in the T-Mobile Lease that T-Mobile knew were false at the time they were made, including the following:

- T-Mobile had agreed to lease 1,000 MSGs for ten years at the cost of $1,100 per MSG.

- The T-Mobile Lease represented "the entire contact between the parties with regard to the subject matter" and was the "final expression of agreement with respect to the subject with respect thereto."

- T-Mobile could terminate the T-Mobile Lease only upon an event of default.

56.     Without T-Mobile's substantial assistance in providing the fraudulent T-Mobile Lease, the fraud would never have gotten off the ground and the Funds would not have suffered damages.

57.     ISC's relationship with DC Solar Distribution began in or around February 2016, when Jeff and Paulette Carpoff met with Frank Kelleher ("**Kelleher**"), Managing Director of ISC, during Speedweeks in Daytona Florida to discuss DC Solar's business. Kelleher actions were on behalf of and binding on ISC and he acted with apparent authority to third parties, including the Funds.

58.     Kelleher and Jeff Carpoff maintained a personal relationship throughout the entire time of the fraud.

59.     ISC knew that the supposed partnership with DC Solar Distribution was a sham because it was DC Solar Distribution that was paying ISC and the supposed leases were bogus. In a November 6, 2017 email, Kelleher wrote to Jeff Carpoff: "I can't thank you enough for your continued support and partnership.  It truly means a lot to me and all ISC stakeholders."

60.     Subsequently, ISC entered into several sublease agreements with DC Solar Distribution (the "**ISC Sublease Agreements**"), under which ISC purportedly agreed to sublease MSGs owned by the Funds from DC Solar Distribution for periods of ten years.

61.     ISC signed at least three ISC Sublease Agreements, on or around December 22, 2016, December 28, 2016, and September 27, 2017, committing to the sublease of 1,000 MSGs for $800 per month and 500 MSGs for $900 per month.  These three ISC Sublease Agreements alone required ISC to pay $150,000,000 over ten years.

62.     Each ISC Sublease Agreement named the Funds as a third party beneficiaries to the ISC Sublease Agreement, entitling the Lessor "to the rights and benefits hereunder" and to "enforce the provisions hereof as if it were a party hereto."

63.     Each ISC Sublease Agreement stated that "This Sublease and the Master Lease constitute the entire contract between the parties with regard to the subject matter hereof, are the final expression of agreement with respect thereto and supersede all prior oral or written discussions or agreements.  There are no Sublease terms which are not contained herein or in the Master Lease."

64.     However, unbeknownst to the Funds, for each of the ISC Sublease Agreements, DC Solar Distribution and ISC also executed corresponding secret addenda contemporaneously with the ISC Sublease Agreements (the "**ISC Sublease Agreement Addenda**").

65.     On each of December 30, 2016, September 27, 2017, December 22, 2017, and August 3, 2018, ISC and DC Solar Distribution entered into an Addendum to Mobile Solar Equipment Sublease (each an "**Addendum #1**").  ISC knew and intended that – contrary to statements in the ISC Sublease Agreement that "[t]here are no Sublease terms which are not contained herein or in the Master Lease," – Addendum #1 purported to modify the agreement between DC Solar Distribution and ISC and add terms.

66.     Addendum #1 purported to add a termination for convenience clause, allowing ISC to terminate the Sublease in its entirety.  Addendum #1 also purported to add a promise that DC Solar Solutions would enter a sponsorship agreement with several affiliates of ISC and to create an option for ISC to terminate the ISC Sublease Agreement based on any of several conditions of the sponsorship agreement, including if ISC simply decided not to enter into the sponsorship agreement.

67.     ISC concealed the Addendum from the Funds. ISC knew that the ISC Sublease Agreement provided to the Funds was false and misleading without the Addendum, and thus was an intentional misrepresentation to and concealment from the Funds that caused harm.

68.     Frank Kelleher, a Vice-President at ISC, and others at ISC knew about the secret ISC Lease Agreement Addenda and knew that these secret agreements were part of a deception on Plaintiffs.  In an email dated December 8, 2016, Kelleher told Alex McGhee of DC Solar: "There is already an element that *feels 'sneaky'* to a few here (addendum to a lease) and I can't afford to add additional question marks to the deal."

69.     Moreover, in ISC internal emails on December 28, 2016, Greg Motto, an executive at ISC, when asked whether there should be a written acknowledgement from the Funds that they were aware of the ISC Sublease Agreement Addenda, told Kelleher, "Simply put, we need to have it writing, verbal understandings *get us in trouble* down the road."

70.     Mr. Motto was right, but Kelleher ignored his advice and now ISC is, as Motto predicted, in trouble.

71.     As a condition for the ISC Sublease Agreement, DC Solar Solutions was required to enter into five sponsorship agreements requiring DC Solar Solutions to pay ISC affiliates $7.5 million per year.  These agreements were concealed from the Funds:

•       On or around October 27, 2017, DC Solar Solutions, Inc. and California Speedway Corporation entered into an Official Status Agreement that required DC Solar Solutions to pay $1,500,000 per year to California Speedway Corporation in sponsorship fees.

- On or around October 27, 2017, DC Solar Solutions, Inc. and Richmond International Raceway entered into an Official Status Agreement that required DC Solar Solutions to pay $1,500,000 per year to Richmond International Raceway in sponsorship fees.

- On or around October 27, 2017, DC Solar Solutions, Inc. and Kansas Speedway Corporation entered into an Official Status Agreement that required DC Solar Solutions to pay $1,500,000 per year to Kansas Speedway Corporation in sponsorship fees.

- On or around October 27, 2017, DC Solar Solutions, Inc. and Talladega SuperSpeedway LLC entered into an Official Status Agreement that required DC Solar Solutions to pay $1,500,000 per year to Talladega SuperSpeedway LLC in sponsorship fees.

- On or around October 27, 2017, DC Solar Solutions, Inc. and Michigan International Speedway, Inc. entered into an Official Status Agreement that required DC Solar Solutions to pay $1,500,000 per year to Michigan International Speedway, Inc. in sponsorship fees.

72. In a December 28, 2017 email, Jeff Carpoff wrote to Kelleher that Carpoff needed an email from Kelleher stating that ISC would be signing the Acceptance Certificates certifying that MSGs had been placed in service in accordance with the ISC Sublease Agreements. Kelleher wrote back the next day: "I'm more than happy to write you an email by end of day that confirms that all 100 have been delivered and the acceptance letters have been distributed for signature. That's easy." In a subsequent email, Kelleher confirmed that the MSGs had been delivered and that acceptance letters were forthcoming.

73. On the following dates, Kelleher, on behalf of ISC, emailed Carpoff Acceptance Certificates certifying that MSGs had been placed in service in accordance with ISC Sublease

Agreements and Kelleher knew and intended that these would be provided to, and relied upon by, the Funds:

- January 18, 2018: Acceptance Certificates signed on behalf of Michigan International Speedway, Inc. and Talladega SuperSpeedway LLC.

- January 19, 2018: Acceptance Certificates signed on behalf of Kansas Speedway Corporation, California Speedway Corporation and Richmond International Raceway.

74.    ISC knew that these Acceptance Certificates were false when executed because they fraudulently mispresented to the Funds that the ISC affiliates were leasing MSGs in accordance with the ISC Sublease Agreements.  ISC knew that these ISC affiliates had the right to terminate the subleases at any time.  ISC also knew that DC Solar was paying these ISC affiliates $7.5 million in side payments that were concealed from Funds.

75.    ISC and DC Solar Distribution entered into the ISC Sublease Agreements with the understanding that the secret ISC Sublease Agreement Addenda would insulate ISC from ever having to fulfill its obligations under the ISC Sublease Agreements.

76.    ISC admitted that the material terms in the ISC Sublease Agreement Addenda which were conspicuously omitted from the ISC Sublease Agreements were "part of the bargain struck between the parties concerning" the ISC Sublease Agreements.

77.    Addendum #1, as executed by DC Solar Distribution and ISC, is not supported by any consideration from ISC; it only confers benefits flowing to ISC from DC Solar Distribution and does not benefit DC Solar Distribution in any way.

78.    The terms and existence of the ISC Sublease Agreement Addenda were hidden from the Funds and neither ISC nor DC Solar Distribution ever sought or received consent from the Funds.

79.    Instead, ISC made affirmative statements that it intended would be communicated to the Funds that deliberately hid the terms and existence of the ISC Sublease Agreement Addenda.

80.    Under the Master Lease Agreements, Funds granted DC Solar Distribution the right to sublease the MSGs to "Permitted Sublessees," which the Master Lease defines as including ISC or "any other sublessee with [Funds'] prior written consent," under a "Permitted Sublease," which the Master Lease defines as "a sublease of any of the Equipment between [DC Solar Distribution] and a Permitted Sublessee under a sublease agreement in the form of Exhibit A hereto as approved by [Lessor]."

81.    The ISC Sublease Agreements contain a clause forbidding the type of modification purported by Addendum #1, stating "THIS SUBLEASE IS NON-CANCELLABLE FOR THE TERM INDICATED ABOVE, SUBLESSEE'S OBLIGATION TO PAY RENT AND ANY OTHER AMOUNTS OWING HEREUNDER IS ABSOLUTE AND UNCONDITIONAL IN ALL EVENTS."  Both DC Solar Distribution and ISC knew this statement was false when they signed the ISC Sublease Agreements, and that they could cancel the lease and eliminate ISC's obligation to pay under the sublease by executing Addendum #1.

82.    ISC knew that DC Solar Distribution was using the apparent existence of ten-year leases contained in the ISC Sublease Agreements to induce the Funds to invest in MSGs through DC Solar Solutions.

83.    ISC also knew that DC Solar Distribution intended to use the ISC Sublease Agreements as part of its pitch to lure the Funds into investing in MSGs as part of a tax credit program.

84.     As ISC knew, the ISC Sublease Agreements were provided to the Funds to induce them to invest in DC Solar Solutions transactions and to purchase MSGs.

85.     ISC also executed Acceptance Certificates that represented to Funds that MSGs had been placed into service in accordance with the ISC Sublease Agreements.  In particular, the Acceptance Certificates stated: "This Sublease and Master Lease constitute the entire contract between the parties with respect to the subject matter hereof."  ISC knew these representations were false when made because the ISC Sublease Agreement Addenda, as well as the sponsorship agreements between DC Solar Solutions and ISC, were a material part of the agreement between ISC and DC Solar Distribution.

86.     ISC signed and issued fraudulent Subleases and Acceptance Certificates with knowledge that these Acceptance Certificates would be provided to the Funds and other third parties and with knowledge that the Funds would rely on these Acceptance Certificates in making their investments in the Funds, including on the following dates: December 22, 2016 and December 28, 2016, June 30, 2017, September 27, 2017.

87.     ISC and M&S also assisted the Fraudsters in obtaining a $46 million loan from SunTrust backed by the supposed ISC Sublease Agreements on or around November 3, 2017. On August 21, 2017, Kelleher and Hacker had a telephone conference with Jeff Carpoff to discuss how to induce SunTrust to make a loan based on the ISC Sublease Agreement.

88.     Keller and M&S concealed material information from Suntrust in connection with the $46 million loan, including that the ISC Sublease Agreement was a sham.

89.     ISC and M&S continued to mislead SunTrust about the nature of the ISC Sublease Agreement up and through the discovery of the fraud in December 2018.  Kelleher and

Hacker participated in multiple conference calls with third parties in October 2018 in which Kelleher and Hacker continued to conceal the sham nature of the ISC Sublease Agreement.

90.     ISC intended for the Funds to rely on the statements in the ISC Sublease Agreements in making their investment decisions.

91.     The Funds did, in fact, reasonably rely on the statements in the ISC Sublease Agreements stating that the agreements represented the entire agreement, that there were no additional terms, and that ISC's obligations under the ISC Sublease Agreements could not be avoided, in making their investment decisions.

92.     The Funds would not have purchased MSGs if they were not led to believe that the ISC Sublease Agreements required ISC to sublease the MSGs from DC Solar Distribution for a period of ten years.

93.     Without ISC's substantial assistance in providing the fraudulent ISC Sublease Agreements, the fraud on the Funds at issue would not have occurred and the Funds would not have lost hundreds of millions of dollars.

94.     Hacker was a Managing Director at M&S with apparent and actual authority to act on behalf of M&S with respect to DC Solar Transactions.

95.     M&S served as a consultant and broker for DC Solar in the DC Solar Transactions.  Hacker provided regular and continuous advice to Jeff Carpoff from 2013 up and through the discovery of the fraud in December 2018.

96.     Carpoff sought Hacker's advice and assistance on a regular basis for the DC Solar Transactions.  An initial review of documents shows more 8,700 emails between and among Carpoff and Hacker.

97. Hacker assisted Carpoff in his various attempts to try to obtain financing from banks using the supposed lease revenues from Plaintiffs as collateral, though Hacker knew of the sham nature of the ISC Sublease Agreement.

98. Mark Santarsiero, the Chief Executive Officer of M&S, was aware of Hacker's participation in the DC Solar Transactions and himself consulted with DC Solar Solutions on behalf of M&S.

99. Jeff Carpoff provided Hacker/M&S with a copy of the secret ISC Sublease Agreement Addenda and M&S concealed it from Plaintiffs.

100. DC Solar Funds VII, VIII, XIV, XXVII, XXXII and XXXV would not have entered into the DC Solar Transactions had M&S not concealed the secret ISC Sublease Agreement Addenda.

101. The Funds would not have purchased MSGs if they were not led to believe by M&S that the ISC Sublease Agreement was real and legitimate.

102. Without M&S's substantial assistance in hiding the true nature of the ISC Sublease Agreement, the fraud on the Funds would not have occurred and the Funds would not have lost hundreds of millions of dollars.

## THE DISCOVERY OF THE FRAUD AND COLLAPSE OF DC SOLAR

103. In late December 2018, the FBI raided DC Solar in connection with an investigation into the fraud perpetrated by the Carpoffs, DC Solar Solutions, and DC Solar Distribution and facilitated by Defendants.

104. The Funds did not discover and could not have discovered through the exercise of reasonable diligence that they had been defrauded until after the United States government disclosed the results of its investigation in February 2019.

105.     Moreover, the Funds did not have knowledge that Defendants had violated their duties and that causes of action existed against the Defendants, and through the exercise of reasonable diligence could not have discovered it earlier.

106.     In February 2019, each of DC Solar Solutions and DC Solar Distribution, along with affiliated entities, filed petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada.

## COUNT I
## FRAUDULENT MISREPRESENTATION/CONCEALMENT
## (AGAINST ALL DEFENDANTS)

107.     Plaintiffs reallege and incorporate each and every paragraph stated above and below inclusive, as though the same were fully set forth hereafter.

108.     The Funds were harmed by the fraud committed by the Fraudsters.  T-Mobile is responsible for the harm because it participated in the fraud by making fraudulent misrepresentations to the Funds.

109.     T-Mobile made false statements that T-Mobile knew and intended would be conveyed or transmitted to the Funds concerning material facts, including the following:

- In the T-Mobile Lease, T-Mobile represented: "There are no Lease terms which are not contained herein."

- T-Mobile was subleasing 1,000 MSGs for 10 years at $1,100 per MSG.

- T-Mobile had agreed to pay DC Solar Distribution more than $100 million in lease payments.

110.     Hansen's relationship with DC Solar created a major conflict of interest and affected the objectivity of Hansen.  Hansen's actions are imputed to T-Mobile and Hansen's acts are T-Mobile's acts.  Moreover, Hansen's relationship with DC Solar was a red flag that T-Mobile's own Code of Conduct warned of and demonstrated to T-Mobile the very problems that existed. Specifically, T-Mobile's own Code of Conduct recognized that fraudulent collusion between employees and supplier like DC Solar was a foreseeable consequence to T-Mobile: "Avoid relationships with any T-Mobile employee that affect or might appear to affect the objectivity of the employee's judgment or that creates or appears to create a conflict of interest for that employee."  Despite being on notice under its own regulations, T-Mobile did nothing to stop the fraud that T-Mobile was participating in through at least Hansen or even investigate. When Hansen left T-Mobile for T-Mobile's supplier DC Solar, T-Mobile still did nothing to stop the fraud that continued to occur, even though T-Mobile was on notice of a problem and had a duty to investigate. Had T-Mobile properly supervised its own employee, followed its own Code of Conduct, or even done a basic investigation into Hansen's relationship with DC Solar, it would have discovered the fraudulent T-Mobile Lease and prevented the fraud.

111.     T-Mobile knew the statements it made regarding its relationship with DC Solar Distribution were false when it made them or made the statements knowing it did not know whether they were true or false.

112.     T-Mobile intended that the Funds would rely on T-Mobile's false statements.

113.     Each of the Funds relied on T-Mobile's false statements.

114.     T-Mobile's false statements were the proximate cause of the damages suffered by the Funds.

115.     T-Mobile intentionally concealed the following material facts from the Funds:

- The T-Mobile Lease was a sham and did not reflect the actual agreement between T-Mobile and DC Solar Distribution

- T-Mobile did not agree to lease 1,000 MSGs under long-term leases

- T-Mobile had the right to cancel its sublease with DC Solar Distribution at any time

- T-Mobile leased MSGs on an as-needed basis and paid rent only for the time T-Mobile was using the MSGs

- T-Mobile paid only $500,000 for leasing MSGs over its entire relationship with DC Solar Distribution

116.    The Funds could not have discovered that these facts were false.  T-Mobile prevented the Funds from discovering these facts and intended to deceive the Funds by concealing these facts.

117.    Had T-Mobile not concealed these facts, the Funds would not have entered into transactions with DC Solar Solutions.

118.    T-Mobile's concealment of these facts was a substantial factor in the harm suffered by the Funds.

119.    ISC knowingly made false statements to the Funds concerning material facts, including the following:

- The ISC Sublease Agreement stated that "This Sublease and the Master Lease constitute the entire contract between the parties with regard to the subject matter hereof, are the final expression of agreement with respect thereto and supersede all prior oral or written

discussions or agreements. There are no Sublease terms which are not contained herein or in the Master Lease."

   &bull;  The Acceptance Certificates stated: "This Sublease and Master Lease constitute the entire contract between the parties with respect to the subject matter hereof."

  120. ISC knew the statements it made regarding its relationship with DC Solar were false when it made them or made the statements knowing it did not know whether they were true or false.

  121. ISC intended that the Funds would rely on ISC's false statements.

  122. Each of the Funds relied on ISC's false statements.

  123. ISC's false statements were the proximate cause of the damages suffered by the Funds.

  124. ISC intentionally concealed the following material facts from the Funds:

   &bull;  The ISC Sublease was a sham and did not reflect the actual agreement between ISC and DC Solar Distribution.

   &bull;  ISC had the right to cancel the ISC Sublease with DC Solar Distribution at any time.

   &bull;  A condition precedent for ISC entering into the ISC Sublease was that DC Solar agreed to pay ISC $7.5 million per year in sponsorship fees.

  125. The Funds could not have discovered that these facts were false. ISC prevented the Funds from discovering these facts and intended to deceive the Funds by concealing these facts.

126.   Had ISC not concealed these facts, the Funds would not have entered into transactions with DC Solar.

127.   ISC's concealment of these facts was a substantial factor in the harm suffered by the Funds.

128.   As a result of ISC's fraudulent misrepresentations, the Funds suffered economic losses in an amount to be proven at trial.

129.   M&S intentionally concealed the following material facts from the Funds:

- The ISC Sublease was a sham and did not reflect the actual agreement between ISC and DC Solar Distribution.

- ISC had the right to cancel the ISC Sublease with DC Solar Distribution at any time.

- The supposed lease revenues to be paid to the Funds were not based on actual lease revenues.

- The lease revenues for MSGs was materially less than what was represented to the Funds.

130.   The Funds could not have discovered that these facts were false. M&S prevented the Funds from discovering these facts and intended to deceive the Funds by concealing these facts.

131.   Had M&S not concealed these facts, the Funds would not have entered into transactions with DC Solar.

132.   M&S's concealment of these facts was a substantial factor in the harm suffered by the Funds.

133.    As a result of M&S's fraudulent misrepresentations, the Funds suffered economic losses in an amount to be proven at trial.

<div align="center">

**COUNT II**
**AIDING AND ABETTING FRAUD**
**(AGAINST ALL DEFENDANTS)**

</div>

134.    Plaintiffs reallege and incorporate each and every paragraph stated above and below inclusive, as though the same were fully set forth hereafter.

135.    The Funds were harmed by the fraud committed by the Fraudsters.

136.    T-Mobile is responsible for the harm because it aided and abetted the fraud.

137.    T-Mobile gave substantial assistance or encouragement to the Fraudsters, including by:

- Fraudulently signing the T-Mobile Lease

- Agreeing to allow the Fraudsters to use T-Mobile's name and reputation in promoting investments in DC Solar Solutions

- Pretending that T-Mobile had leased more than $130 million of MSGs from DC Solar Distribution

138.    T-Mobile's conduct was a substantial factor in causing harm to the Funds.

139.    T-Mobile had actual knowledge of the fraud being perpetrated on the Funds by the Fraudsters and their associates. Specifically, T-Mobile had actual knowledge that included but was not limited to the following:

- The T-Mobile Lease was fraudulent

- T-Mobile did not agree to lease 1,000 MSGs in September 2015

- T-Mobile paid only $500,000 for leasing MSGs over its entire relationship with DC Solar Distribution

140.    Without T-Mobile's substantial assistance, the Fraudsters and their associates would not have been able to defraud the Funds. In fact, T-Mobile's involvement gave the imprimatur of legitimacy to Fraudsters' fraudulent activity as viewed by the Funds.

141.    As a result of T-Mobile's assistance to the Fraudsters' fraud, the Funds suffered economic losses in an amount to be proven at trial.

142.    The Funds were harmed by the fraud committed by the Fraudsters and ISC is responsible for the harm because it aided and abetted the Fraudsters in committing the fraud.

143.    ISC knew that fraud was being committed by the Fraudsters against the Funds.

144.    ISC gave substantial assistance or encouragement to the Fraudsters, including by:

- Fraudulently signing the ISC Sublease Agreements.

- Pretending that ISC had leased more than $150 million of MSGs from DC Solar.

- Executing separate ISC Sublease Agreements and ISC Sublease Agreement Addenda to conceal the additional terms in the ISC Sublease Agreement Addenda.

145.    ISC's conduct was a substantial factor in causing harm to the Funds.

146.    ISC had actual knowledge of the fraud being perpetrated on the Funds by the Fraudsters and their associates. Specifically, ISC had actual knowledge that included but was not limited to the following:

- The ISC Sublease Agreement was a sham.

- ISC did not agree to lease 1,500 MSGs in 2016 and 2017 under long-term leases.

- ISC never intended to lease the MSGs the ISC Sublease Agreements required it to lease.

147.    Without ISC's substantial assistance, the Fraudsters and their associates would not have been able to defraud the Funds. In fact, ISC's involvement gave the imprimatur of legitimacy to Fraudsters' fraudulent activity as viewed by the Funds.

148.    As a result of ISC's assistance of the Fraudsters' fraud, the Funds suffered economic losses in an amount to be proven at trial.

149.    The Funds were harmed by the fraud committed by the Fraudsters.  M&S is responsible for the harm because it aided and abetted the fraud.

150.    M&S's conduct was a substantial factor in causing harm to the Funds.

151.    M&S had actual knowledge of the fraud being perpetrated on the Funds by the Fraudsters and their associates. Specifically, M&S had actual knowledge that included but was not limited to the following:

- The supposed lease revenues being provided to Plaintiffs were false and misleading and did not represent actual lease revenues or the MSGs

- The ISC Sublease Agreement was fraudulent

- ISC did not agree to lease 1,500 MSGs in 2016 and 2017

- ISC never intended to lease the MSGs the ISC Sublease Agreements required it to lease

152.    Without M&S's substantial assistance, the Fraudsters and their associates would not have been able to defraud the Funds.

153.   As a result of M&S's assistance in the Fraudsters' fraud, the Funds suffered economic losses in an amount to be proven at trial.

<div align="center">

**COUNT III**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

</div>

154.   Plaintiffs reallege and incorporate each and every paragraph stated above and below inclusive, as though the same were fully set forth hereafter.

155.   ISC knowingly made misrepresentations to the Funds or failed to disclose material facts that demonstrated ISC's representations were false, including the following:

- The ISC Sublease Agreement stated that "This Sublease and the Master Lease constitute the entire contract between the parties with regard to the subject matter hereof, are the final expression of agreement with respect thereto and supersede all prior oral or written discussions or agreements.  There are no Sublease terms which are not contained herein or in the Master Lease."

- The Acceptance Certificates stated: "This Sublease and Master Lease constitute the entire contract between the parties with respect to the subject matter hereof."

156.   T-Mobile knowingly made misrepresentations to the Funds or failed to disclose material facts that demonstrated its representations were false, including the following:

- The T-Mobile Lease was fraudulent

- T-Mobile did not agree to lease 1,000 MSGs in September 2015

- T-Mobile paid only $500,000 for leasing MSGs over its entire relationship with DC Solar Distribution

157.   M&S knowingly made misrepresentations to the Funds or failed to disclose material facts that demonstrated its representations were false, including the following:

- The ISC Sublease was a sham and did not reflect the actual agreement between ISC and DC Solar Distribution.

- ISC had the right to cancel the ISC Sublease with DC Solar Distribution at any time.

- The supposed lease revenues to be paid to the Funds were not based on actual lease revenues.

158.   ISC, T-Mobile and M&S had no reasonable grounds for believing the representations to the Funds were true when made.

159.   T-Mobile had a duty to supervise its own employees and officers. T-Mobile failed to exercise reasonable care of competence in obtaining or communicating the information. T-Mobile negligently supervised its officers and employees, including Alan Hansen, permitting false statements to be made to third parties, including the Funds. Hansen's relationship with DC Solar created a major conflict of interest and affected the objectivity of Hansen. Hansen's actions are imputed to T-Mobile and Hansen's acts are T-Mobile's acts. Moreover, Hansen's relationship with DC Solar was a red flag that T-Mobile's own Code of Conduct warned of and demonstrated to T-Mobile the very problems that existed. Specifically, T-Mobile's own Code of Conduct recognized that fraudulent collusion between employees and supplier like DC Solar was a foreseeable consequence to T-Mobile: "Avoid relationships with any T-Mobile employee that affect or might appear to affect the objectivity of the employee's judgment or that creates or appears to create a conflict of interest for that employee." Despite being on notice under its own regulations, T-Mobile did nothing to stop the fraud that T-Mobile was participating in through at least Hansen or even investigate. When Hansen left T-Mobile for T-Mobile's supplier DC Solar, T-Mobile still did nothing to stop the fraud that continued to occur, even though T-Mobile was on notice of a problem and had a duty to investigate. Had T-Mobile properly supervised its own

employee, followed its own Code of Conduct, or even done a basic investigation into Hansen's relationship with DC Solar, it would have discovered the fraudulent T-Mobile Lease and prevented the fraud.

160.   ISC had a duty to supervise its own employees and officers.  ISC failed to exercise reasonable care of competence in obtaining or communicating the information.  ISC negligently supervised its officers and employees, including Frank Kelleher, permitting false statements to be made to third parties, including the Funds.

161.   M&S had a duty to supervise its own employees and officers.  M&S failed to exercise reasonable care of competence in obtaining or communicating the information.  M&S negligently supervised its officers and employees, including Barry Hacker, permitting false statements to be made to third parties, including the Funds.

162.   ISC, T-Mobile and M&S each intended the Funds to rely on their representations.

163.   The Funds reasonably relied on ISC's, T-Mobile's and M&S's false representations.

164.   The Funds' reliance on ISC's, T-Mobile's and M&S's false representations was a substantial factor in causing the Funds' harm.

165.   ISC, T-Mobile, and M&S each in the course of their business, profession, or employment, or in transactions in which ISC, T-Mobile and M&S each had a pecuniary interest, supplied false information for the guidance of others, including the Funds or a class of persons including the Funds, in their business transactions.

166.   ISC, T-Mobile and M&S each failed to exercise reasonable care of competence in obtaining or communicating the information.

167.   The Funds justifiably relied upon the information supplied by ISC, T-Mobile and M&S causing Funds damage.

168.   ISC, T-Mobile and M&S each owed a duty of care to the Funds.

169.   ISC, T-Mobile and M&S each negligently made false statements of material fact.

170.   ISC, T-Mobile and M&S each intended that the Funds would act in reliance upon the statements.

171.   ISC, T-Mobile and M&S each knew the Funds probably would rely on the statements, which, if false, would cause loss or injury to the Funds.

172.   The Funds justifiably acted in reliance on the statements.

173.   The Funds suffered damage as a result of ISC's, T-Mobile's and M&S's negligent misrepresentations.

174.   ISC's, T-Mobile's and M&S's negligent misrepresentations were a substantial, direct and proximate cause of Funds' substantial losses in an amount to be proven at trial.


## PRAYER FOR RELIEF

WHEREFORE, Receiver respectfully requests judgment against Defendants as follows:

1.   actual, compensatory and consequential damages in an amount to be proven at trial;

2.   rescission or rescissory damages;

3.   pre-judgment and post-judgment interest as allowed by law;

4.   disgorgement and/or return of all fees paid to Defendants, including attorneys' fees; and

5.     such other and further legal and equitable relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Receiver hereby demands a trial by jury of all issues so triable.


Dated:  December 17, 2020

<div style="margin-left: 45%;">

/s/ Steven W. Thomas
Steven W. Thomas (Florida Bar # 0075428)
Thomas, Alexander, Forrester & Sorensen LLP
14 27th Avenue
Venice, California 90291
steventhomas@tafattorneys.com
Tel:     (310) 961-2536
Fax:     (310) 526-6852


/s/ Hector J. Lombana
Hector Lombana, Esq. (Florida Bar # 238813)
LOMBANA HOELLE TRIAL LAW
2745 Ponce de León Blvd.
Coral Gables, FL 33134
hector@lhtrial.law
Tel: (305) 859-0092

*Counsel for Funds VII, VIII, XIV, XXVII, XXXII and XXXV*

</div>